UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENNIS D. DAVIS,

                   Plaintiff,             Civil Action No. 12-13804
                                        Honorable Sean F. Cox
                                        Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                   Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 16]

      Plaintiff Dennis D. Davis ("Davis") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [11, 16], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

## I.      RECOMMENDATION

      For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Davis is not disabled under the Act. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [16] be GRANTED, Davis' Motion for Summary Judgment [11] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decision be AFFIRMED.

## II.      REPORT

### A.      Procedural History

On October 5, 2009, Davis filed an application for SSI, alleging a disability onset date of

November 1, 2005. (Tr. 155-58). This application was denied initially on December 15, 2009. (Tr. 108-11). Davis filed a timely request for an administrative hearing, which was held on April 20, 2011, before ALJ Peter Dowd. (Tr. 41-104). Davis, who was represented by attorney Michael Jankowski, testified at the hearing, as did witness Ella Jones (Davis' Community Mental Health Case Manager), and vocational expert Stephanie Lorey. (*Id.*). On June 2, 2011, the ALJ issued a written decision finding that Davis is not disabled. (Tr. 17-27). On July 9, 2012, the Appeals Council denied review. (Tr. 1-3). Davis filed for judicial review of the final decision on August 28, 2012. (Doc. #1).

**B.    Background**

*1.    Disability Reports*

In an October 5, 2009 disability field office report, Davis reported that his alleged onset date was November 1, 2005. (Tr. 179). The claims examiner noted that, during a face-to-face interview, Davis had difficulty talking, answering, and concentrating. (Tr. 180-81). The claims examiner also noted that Davis "seemed a little slower than most" and that he "had body odor and his skin was flaky." (Tr. 181).

In an undated disability report, Davis indicated that he completed high school and one year of college. (Tr. 190). Davis further indicated that his ability to work is limited by psychosis, anxiety, and schizophrenia. (Tr. 184). Davis reported that these conditions first interfered with his ability to work on November 1, 2005. (*Id.*). Since that time, Davis has received some minimal compensation to take care of his disabled mother. (Tr. 185-86).

Davis indicated that he had treated with several medical providers regarding his mental impairments. (Tr. 187-89). At the time of the report, he was taking several medications, including benztropine, Klonopin, and Zyprexa. (Tr. 189).

2

In a function report dated November 2, 2009,[1] Davis reported that he lives in a house with family.  (Tr. 206).  When asked to describe his daily activities, Davis indicated that he prepares meals for himself and his mother, cares for his mother, does housework, and – in his free time – watches television, plays video games, or rides his bike.  (*Id.*).  He is responsible for caring for his mother; he uses a "lift" to get her out of bed and assists her with bathing, dressing, and eating.  (Tr. 207).  When asked to describe what he could do before the onset of his condition that he can no longer do, Davis indicated: "stayed the same."  (*Id.*).  He has no problem with personal care, but he does sometimes need reminders to take his medication.  (Tr. 207-08).  Davis prepares his own meals on a daily basis.  (Tr. 208).  He is able to clean the house, sweep, mow the lawn, rake the yard, do laundry, and remove snow.  (*Id.*).  He goes outside every day and is able to drive a car.  (Tr. 209).  He goes grocery shopping on a weekly basis, and he is able to handle money.  (*Id.*).  His hobbies include watching television, playing video games, biking, and reading.  (Tr. 210).  He spends time with others on a weekly basis, attending church, Bible study, and practicing the saxophone.  (*Id.*).

When asked to identify functions impacted by his condition, Davis checked memory, completing tasks, concentration, understanding, following instructions, and getting along with others.  (Tr. 211).  He said, however, that he has no trouble following written instructions, he finishes what he starts, and he is able to follow spoken instructions if he is "paying attention."  (*Id.*).  He gets along well with authority figures and has never been fired from a job because of problems getting along with other people.  (Tr. 212).  He handles stress well, but he does have "some difficulty" handling changes in routine.  (*Id.*).

In a third party function report dated November 2, 2009, Davis' case manager at Saginaw

---

[1] Davis completed a second Function Report on February 5, 2011, which was largely consistent with this report.  (Tr. 244-51).

County Community Mental Health ("CMH"), Ella Jones, indicated that Davis cares for his mother and his pets. (Tr. 196). Jones also indicated that Davis has no trouble with personal care, but he does need reminders to take medication. (Tr. 196-97). She reported that Davis prepares his own meals, performs housework, and does yard work. (Tr. 197-98). He goes outside every day and is able to drive, go grocery shopping, and handle money. (Tr. 198). Jones also reported that Davis enjoys watching television, playing video games, reading, and riding his bike. (Tr. 199). According to Jones, Davis sometimes gets upset with all of the things he has to do to help his family. (Tr. 200). Jones indicated that Davis has difficulty with memory, completing tasks, concentrating, following instructions, and getting along with others, although he is better able to pay attention now that he is taking medication. (*Id.*). Jones reported that Davis is able to follow instructions and finish what he starts, but he can lose focus if there are things going on around him. (*Id.*). According to Jones, Davis becomes agitated and angry when he is under stress, and he becomes frustrated with changes in routine. (Tr. 201).

### 2. *The Administrative Hearing*

#### a. *Plaintiff's Testimony*

At the April 20, 2011 hearing before the ALJ, Davis testified that he completed high school and then took some classes at Delta College. (Tr. 49). Eventually, he dropped out of college because he was having difficulty passing "two very crucial classes" and because his mother required additional care. (*Id.*). At the time of the hearing, Davis was taking online college classes at Colorado Technical University and was seeking to obtain an associate's degree in health care administration. (Tr. 50). He lives in a house with his mother and his older brother, both of whom receive disability benefits. (Tr. 47-48). He has not worked since 2009, and his income consists of $208 per month in food stamps and $269 per month in cash assistance from

the State of Michigan.  (Tr. 52-54).

Davis testified that he was admitted to an inpatient mental health treatment facility in 2005 after he caused a car accident and then reported experiencing delusions and hearing voices from God.  (Tr. 56-57).  He recognizes now that, at the time, he was having a psychotic episode, but he did not receive any outpatient mental health treatment after he was discharged in 2005. (Tr. 58-59).  In August of 2009, Davis was again hospitalized briefly after he got into an argument with his mother and brother and the police were called.  (Tr. 59-60).  At that time, Davis was diagnosed with schizoaffective disorder.  (Tr. 60).  Subsequently, Davis has received outpatient mental health treatment at CMH.  (Tr. 62).  He sees Dr. Vize (a psychiatrist) for a medication review every three months, and he sees his therapist every other week for counseling (although he has, on occasion, forgotten to attend a scheduled session).  (Tr. 62-63, 81-82). Davis testified that, as a result of this treatment, he has been doing "reasonably well."  (Tr. 76). When asked why he could not work, Davis did not refer to his mental impairment; rather, he indicated that he does not yet have a college degree, and he believes most employers prefer this qualification.  (Tr. 76).

Davis testified that he takes several medications, including clonazepam (Klonopin), benztropine, and Geodon.  (Tr. 63).  These medications have improved his mental health, making it easier for him to handle stress without getting angry and to stay on task (although, occasionally, he still becomes distracted and "forget[s] things").  (Tr. 63-64).  He no longer experiences hallucinations or delusions.  (Tr. 64).  Davis testified, however, that he finds it difficult to concentrate when he is under stress, particularly if he feels like someone is "looking over [his] shoulder."  (Tr. 79).

Davis testified that he has some friends from church, as well as others that he interacts

5

with online.  (Tr. 66).  For the most part, he has positive daily interactions with his mother and

brother.  (*Id.*).  He is able to attend to his own personal care, care for his mother, prepare meals,

clean the house, do laundry, do yard work, use a computer, eat at restaurants, and drive.  (Tr. 72-

73).  Once a week, he goes to a store in Bay City, Michigan, where he plays Dungeons and

Dragons, a fantasy role-playing game, with his brother and a few others.  (Tr. 74).

*b.*     *Third-Party Witness Testimony*

Ella Jones ("Jones"), a third-party witness, also testified at the hearing.  (Tr. 83-90).

Jones testified that she had been Davis' case manager at CMH since the fall of 2009.  (Tr. 83-

84).  In that role, Jones is responsible for monitoring Davis' condition, ensuring he takes his

medication, and referring him to available group activities.  (Tr. 86).  Jones testified that Davis

has been compliant with his treatment, although she has had to remind him of appointments on

occasion.  (Tr. 86-87).  Jones testified that, in the workplace, Davis would have difficulty

maintaining a consistent pace because he tends to focus on irrelevant details, rather than on what

actually needs to be done.  (Tr. 89).  In addition, Jones believes that Davis would have difficulty

making a plan or coming to a decision.  (Tr. 90).  Jones does not, however, believe Davis has any

problems with memory.  (*Id.*).

*c.*     *Vocational Expert's Testimony*

Stephanie Lorey testified as an independent vocational expert ("VE").  (Tr. 90-99).  The

VE characterized Davis' past work as a home health caregiver as semi-skilled in nature and

medium in exertion (although he performed it as heavy, unskilled work).  (Tr. 91-92).  The ALJ

asked the VE to imagine a claimant of Davis' age, education, and work experience, who could

perform work at all exertional levels but with the following mental limitations:  only simple,

routine and repetitive work activities performed in a stable work environment; only superficial

6

contact with supervisors and coworkers; and no interaction with the general public. (Tr. 92-93). The VE testified that the hypothetical individual would be capable of working in the positions of sorter (3,200 jobs in Michigan's lower peninsula), inspector (2,200 jobs), and bench hand (8,500 jobs). (Tr. 93-94).

      *3.*    *Medical Evidence*

      *a.*    *2005*

The first medical evidence of any mental health treatment received by Davis stems from a June 2005 incident in which he caused a car accident and then was admitted to HealthSource Saginaw's Behavioral Medicine Center after he was confused, delusional, and claimed to be talking to the devil. (Tr. 263-64, 267-68). On intake, Davis was "very delusional," talking about "God and Satan and the spiritual war." (Tr. 268). His thought processes were grossly disorganized and irrelevant, his affect was somewhat labile, and his memory was impaired. (*Id.*). He was assigned a Global Assessment of Functioning ("GAF")[2] score of 20, placed on Risperdal, and treated on an inpatient basis (with medication and counseling) for a few days. (*Id.*). On discharge, Davis' diagnosis was psychosis not otherwise specified, and his GAF score was 55. (Tr. 264). Although Davis initially had some side effects from the medication prescribed, his medications were changed, and as a result, the side effects eased. (Tr. 269-70). By July of 2005, Davis reported feeling much better. (Tr. 269-70). Between 2005 and August of 2009, Davis did not receive any mental health treatment. Indeed, Davis later acknowledged that he only took the prescribed medications for about two weeks following his July 2005 discharge from HealthSource and, until mid-2009, he did not experience any "significant decompensations or

---

[2] GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

flare-ups." (Tr. 292, 364).

> b.    2009

In August of 2009, Davis was hospitalized briefly at Bay Regional Medical Center after he was brought into the emergency room by police. (Tr. 277-79, 364). He had gotten into a verbal argument with his mother and was very agitated, manic, and using pressured, loud, and rapid speech. (Tr. 409). At that time, Davis was diagnosed with schizoaffective disorder and assigned a GAF score of 20. (Tr. 277-78). During his hospital stay, which lasted less than one week, Davis attended group and individual therapy sessions. (Tr. 296-306, 352-62). As he was stabilized on medication, he became calmer, more logical, and more focused. (Tr. 285). His hygiene also improved. (*Id.*). Davis acknowledged that he needed to continue to take his medication on a regular and consistent basis. (Tr. 286). Over the course of Davis' admission, his prognosis improved from "extremely guarded" to "good." (Tr. 278, 286). By the time of his discharge, Davis' GAF score had improved to 45. (Tr. 278).

After Davis was released from the hospital, he saw his primary care physician on September 4, 2009, where it was noted that he was "doing better on meds" and that his schizoaffective disorder was stable. (Tr. 422).

Davis first saw Ruth Frais, a therapist at CMH, on September 9, 2009. (Tr. 379-93). Davis acknowledged that, prior to his recent hospitalization, he had been yelling and out of control in his behavior toward family members. (Tr. 383). However, he stated that his medications had a "calming" effect on him and were "helping significantly." (*Id.*). He also reported that he usually remembered to take his medication on his own, was able to drive, did most of his family's grocery shopping, did his own laundry, managed his own finances, and was part of a church band and community. (Tr. 384). His GAF score was 65. (Tr. 390).

8

On September 25, 2009, Davis saw Lesa Rogner at CMH for a pre-screening assessment. (Tr. 401-05).  He reported being anxious, unable to concentrate, and unable to sit still.  (Tr. 404). He rocked back and forth at times and otherwise appeared to have psychomotor agitation.  (*Id.*). He did not meet the criteria for inpatient hospitalization, however, and he was directed to see his family doctor regarding the anxiety and follow up at CMH the following week.  (*Id.*).

The next day, September 26, 2009, Davis went to the emergency room because he was about to run out of his prescribed medications and was concerned that if he did not take his medication, he would go "downhill."  (Tr. 366).  Davis' prescriptions were refilled and, although he suffered some adverse side effects during September and October of 2009, those side effects were eventually alleviated with changes to his medication, and his schizoaffective disorder remained stable.  (Tr. 367, 416-20).

On September 30, 2009, Davis had a psychiatric evaluation at CMH with Dr. Gary Vize. (Tr. 373-78).  On examination, Dr. Vize found Davis cordial and cooperative; his speech was non-pressured and monotonal; and he was alert and fully oriented, with good concentration, intact memory, and a coherent thought process.  (Tr. 375).  Dr. Vize diagnosed Davis with schizoaffective disorder and assigned a GAF score of 47.  (Tr. 373).

Davis next saw Dr. Vize on December 7, 2009.  (Tr. 431-32).  At that time, Dr. Vize noted that Davis says "he continues to be stable and to do relatively well."  (Tr. 432).  He had dirty jeans, but was alert, cooperative, and coherent, with no overt psychotic symptoms.  (*Id.*). Dr. Vize determined that Davis should continue on his current medications and return in four months.  (*Id.*).

On December 14, 2009, state agency psychologist Judy Strait examined Davis' records and completed a Psychiatric Review Technique and Mental Residual Functional Capacity

9

Assessment.  (Tr. 433-50).  Dr. Strait opined that Davis was moderately limited in activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace, with one or two episodes of decompensation, each of extended duration.[3]  (Tr. 443).  In completing her functional capacity assessment, Dr. Strait stated:

> The claimant's cognition and concentration are moderately impaired from the symptoms of schizoaffective disorder and the medications used to treat the claimant.  He will have difficulty with complex tasks and demanding work environments.  His social functioning is restricted, and he will not work well with the general public.  He will work best alone or in a small, familiar group.  Adaptation will vary.  The claimant retains the capacity to perform simple, routine tasks on a sustained basis.

(Tr. 449).

On December 28, 2009, Ella Jones completed a Psychiatric/Psychological Examination Report for the State of Michigan Family Independence Agency, which was co-signed by Dr. Vize.  (Tr. 478-81).  In that report, Ms. Jones opined that Davis was markedly limited in ten areas of functioning, including the ability to maintain attention and concentration for extended periods; work in coordination with or proximity to others; make simple work-related decisions; complete a normal workday/workweek without interruptions from psychologically based symptoms; interact appropriately with the general public; accept instructions and respond appropriately to criticisms from supervisors; get along with co-workers and peers; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; and travel in unfamiliar places or use public

---

[3] Specifically, Dr. Strait opined that Davis was moderately limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; maintain regular attendance; sustain ordinary routines without special supervision; work in coordination with or proximity to others; complete a normal workday/workweek without interruptions from psychologically based symptoms; interact appropriately with the general public; accept instructions and respond appropriately to criticisms from supervisors; get along with co-workers and peers; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; and travel in unfamiliar places or use public transportation.  (Tr. 447-48).

10

transportation.  (Tr. 480-81).

<em>c.      2010</em>

It does not appear that Davis saw Dr. Vize again until August 9, 2010.  (Tr. 509-10).  At that visit, Davis reported that he continued to take his medications and he thought they were working.  (Tr. 510).  His mood had been stable, and he presented with coherent thought processes, no irritability, and no overt psychotic symptoms.  (*Id.*).

That same day, Ella Jones completed another Psychiatric/Psychological Examination Report, which was again co-signed by Dr. Vize.  (Tr. 490-93).  In that report, Ms. Jones opined that Davis was markedly limited in only two areas of functioning – the ability to make simple work-related decisions, and the ability to set realistic goals or make plans independently of others.  (Tr. 491).  Ms. Jones also noted that Davis' hygiene and appearance had improved, and his symptoms had decreased with medication compliance.  (Tr. 492-93).

On August 30, 2010, Davis saw Ms. Jones for an annual assessment.  (Tr. 498-508).  She noted that Davis was cooperative with treatment and understood the fact that he needed to continue to take his medications and participate in therapy sessions in order to prevent his symptoms from returning.  (Tr. 500).  Ms. Jones noted that, at times, Davis' hygiene had been poor, but his grooming and appearance had improved.  (Tr. 502).

### C.      Framework for Disability Determinations

Under the Act, SSI is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be

11

determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps ….  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.     The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Davis is not disabled under the Act.  At Step One, the ALJ found that Davis has not engaged in substantial gainful activity since his application date.  (Tr. 19).  At Step Two, the ALJ found that Davis has the severe impairment of schizoaffective disorder.  (Tr. 19-20).  At Step Three, the ALJ found that Davis' impairment does not meet or medically equal a listed impairment.  (Tr. 20-22).

12

The ALJ then assessed Davis's residual functional capacity ("RFC"), concluding that he is capable of performing the full range of work at all exertional levels, but with the following nonexertional mental limitations: he is limited to simple, routine, and repetitive work activities performed in a stable work environment; and he can mentally maximally tolerate superficial contacts with supervisors and coworkers, but should not work with the general public in a work setting. (Tr. 22-25).

At Step Four, the ALJ determined that Davis has no past relevant work. (Tr. 25). At Step Five, the ALJ concluded, based in part on the VE's testimony, that Davis is capable of performing a significant number of jobs that exist in the national economy. (Tr. 26). As a result, the ALJ concluded that Davis is not disabled under the Act. (Tr. 27).

**E.    Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)

13

(internal quotations omitted).   In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).   If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

## F.     Analysis

In his motion for summary judgment, Davis argues that the ALJ erred in failing to give controlling weight to the two opinions signed by his treating physician (Dr. Vize) and social worker (Ella Jones).  (Doc. #11 at 7-11).  In a related argument, Davis asserts that the ALJ also erred in failing to give "good reasons" for giving these opinions only little weight.  (*Id.* at 11-21).  Each of these arguments will be discussed in turn.

14

1.    *The Opinions at Issue*

Davis first argues that the ALJ erred in not giving the opinions of his treating psychiatrist, Dr. Vize, controlling weight. (*Id.* at 7-11). In response, the Commissioner asserts that "[i]t is not clear that Dr. Vize provided a treating source opinion" (Doc. #16 at 11), as Ms. Jones acknowledged during her hearing testimony that *she* provided the opinions at issue, and Dr. Vize merely co-signed the forms. (Tr. 87-88). If the December 2009 and August 2010 opinions at issue are, in fact, those of Ms. Jones – as opposed to Dr. Vize – they would not be entitled to deference, as Ms. Jones is not an acceptable medical source within the meaning of the applicable regulations. *See* 20 C.F.R. §416.927(a); *Soc. Sec. Rul.* 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006); *Boyett v. Apfel*, 8 F. App'x 429, 433 (6th Cir. 2001) (social workers are not acceptable medical sources).

Even assuming, for a moment, that the opinions can be attributed to Dr. Vize, that does not necessarily answer the question of whether the treating physician rule, and its concomitant level of deference, are implicated. The evidence establishes that Plaintiff saw Dr. Vize on only three occasions over an eleven-month period (September 30, 2009, December 7, 2009, and August 9, 2010). (Tr. 373-78, 431-31, 509-10). Such limited interactions call into doubt whether Dr. Vize should be considered a treating source, and, at a minimum, suggest that his opinions are entitled to less weight than if he and Davis had a more extensive treating relationship. *See, e.g.,* 20 C.F.R. §416.927(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."); *Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 (6th Cir. 2011) ("[I]t is questionable whether a physician who examines a patient only three times over a four-month period is a treating source – as opposed to a nontreating (but examining)

source.").  Regardless, however, the Court need not decide whether the opinions at issue were those of Dr. Vize or Ms. Jones, or whether Dr. Vize is a treating source within the meaning of the regulations.  Even assuming that the opinions are Dr. Vize's, and that he is a treating source, the ALJ provided "good reasons" for declining to give these opinions controlling weight, as set forth in detail below.

> 2.      *The ALJ Gave "Good Reasons" for*
> *Giving the Opinions at Issue Little Weight*

Giving Davis the benefit of the doubt, and assuming that the opinions at issue are, in fact, those of a treating source, the next issue is whether they are entitled to controlling weight.  An ALJ "'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'"  *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (internal quotations omitted).  While treating source opinions are entitled to controlling weight under these circumstances, it is "error to give an opinion controlling weight simply because it is the opinion of a treating source" unless it is well-supported and consistent with the record as a whole.  *Soc. Sec. Rul.* 96-2p, 1996 WL 374188, at *2 (July 2, 1996); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("Treating physicians' opinions are only given such deference when supported by objective medical evidence.").  If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, "considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician."  *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)); *see also* 20 C.F.R. § 416.927(c)(2)

16

(ALJ must "give good reasons" for weight given to treating source opinion).

In this case, the ALJ thoroughly considered the opinions of Dr. Vize that would have imposed various marked limitations on Davis, *see supra* at 10-11, and determined that they were entitled to "little weight"[4] because they were "inconsistent with the evidence of record and much of the claimant's testimony at hearing." (Tr. 24-25). Davis claims that the ALJ's "broad assertion that the opinion was not supported by the record is inadequate." (Doc. #11 at 11 (citing *Rogers*, 486 F.3d at 245-46)). But that mischaracterizes the ALJ's comprehensive analysis of the issue. The ALJ did far more than merely assert, in conclusory fashion, that Dr. Vize's opinions were not supported by the evidence of record; indeed, he undertook a thorough, multi-page analysis of the record evidence and Davis' own hearing testimony and explained, in detail, the numerous ways in which the bulk of that evidence was inconsistent with Dr. Vize's opinions. (Tr. 20-25).[5]

Moreover, to the extent Davis argues that the ALJ erred in failing to explicitly discuss each of the factors set forth in 20 C.F.R. §416.927(c)(2), such an argument is without merit. Courts have recognized that, in weighing medical opinions, an ALJ is not required to discuss each and every one of these factors. *See Beston v. Comm'r of Soc. Sec.*, 2010 WL 1064434, at *2 (E.D. Mich. Mar. 22, 2010) (ALJ need not "specifically articulate [his] analysis" as to each of the §927 factors); *see also Curler v. Comm'r of Soc. Sec.*, 2013 WL 1286151, at *2 (E.D. Mich. Mar. 28, 2013) ("While the ALJ did not discuss every §927 factor, the ALJ did balance at least

---

[4] Davis also argues that the ALJ failed to determine whether Dr. Vize's opinions should be "entitled to deference," even if they were not entitled to controlling weight. (Doc. #11 at 21). This argument is without merit. As set forth in greater detail below, the ALJ thoroughly reviewed the evidence of record and determined that Dr. Vize's opinions were inconsistent with both the medical evidence and much of Davis' hearing testimony. (Tr. 24-25). It was because these opinions were not supported by the record evidence that the ALJ gave them "little weight." (*Id.*). Thus, the ALJ reasonably decided not to give deference to Dr. Vize's opinions.

[5] *See* discussion *infra* at 18-19.

two factors [supportability and consistency]," which was sufficient.).  Here, despite the fact that the ALJ did not specifically discuss each factor – as Davis apparently would prefer – it is clear that he considered them in his opinion.[6]  And, most importantly, the ALJ's evaluation of Dr. Vize's opinions turned, in large part, on two of the most important factors set forth in §416.927(c)(2) – supportability of the opinions and consistency of the opinions with the record as a whole – and his consideration of these factors was more than adequate.

In determining Davis' RFC, the ALJ carefully weighed the evidence in the case, including Davis' activities of daily living and Dr. Vize's medical opinions.  (Tr. 20-25).  It was during this lengthy discussion that the ALJ pointed out that Dr. Vize's opinions were not consistent with either the overwhelming evidence of record, or with the state agency psychologist's opinion that Davis "retains the capacity to perform simple, routine tasks on a sustained basis."  (*Id.*).  The ALJ supported his RFC finding with a significant amount of evidence, including Davis' ability to maintain focus for extended periods of time on relatively complex activities (such as computer use, online college courses, and fantasy role-playing games); his serving as his mother's primary caregiver (at least "sporadically"); his ability to interact appropriately with strangers, acquaintances, and family members; and his "appropriate and impressively articulate" testimony at the hearing.  (Tr. 24-25).  *See also* Tr. 20 (noting that Davis "performs household chores, prepares meals, cares for pets…reads…") and 24 (noting that "at the hearing, [Davis] appeared focused, cooperative, pleasant and articulate (even bright)…").

Moreover, the ALJ painstakingly examined the record to determine the nature of Davis' limitations and to incorporate those limitations into his RFC finding.  The ALJ specifically found that Davis "becomes easily distracted and has difficulty completing tasks when he experiences

---

[6] For example, the ALJ noted the limited relationship between Davis and Dr. Vize, describing Dr. Vize as "a supervising psychiatrist who conducts periodic medication reviews."  (Tr. 24).

elevated stress" and that Davis' stress is related to feeling "pressured to complete tasks, when he is distracted by interactions with others or when he feels overly-supervised ('when someone is looking over his shoulder')."  (Tr. 23).  The ALJ specifically incorporated his conclusion that Davis reacts poorly to stress – particularly stress that stems from social interaction – into his RFC finding by restricting Davis to simple, routine, and repetitive work activities in a stable work environment, with only superficial contact with supervisors and coworkers and no interaction with the general public.  (Tr. 22).

Beyond that, the ALJ reasonably concluded that Dr. Vize's opinions, and the significant limitations he would impose, simply do not accurately describe Davis' abilities.  (Tr. 23).  For example, the ALJ found that Davis has been "proactive and responsible in following his prescribed treatment regimen" and, as a result, his symptoms have been largely controlled with medication since August of 2009.  (Tr. 23-24).  This conclusion is supported by substantial evidence.  Indeed, Davis repeatedly informed his medical providers that the prescribed medications helped him, calmed him down, and allowed him to control his behavior.  (Tr. 366, 383, 500, 510).  All of the medical professionals who evaluated Davis noted that his condition was stable while he was on medication, and the medication controlled his symptoms.  (Tr. 270, 285-86, 311-13, 416-17, 422, 432, 500, 510).  In addition, even Dr. Vize's two medical opinions show improvement:  in December of 2009, he opined that Davis was markedly limited in ten areas of function; by August of 2010, however, Davis was found markedly limited in only two areas.  (Tr. 480-81, 490-91).  And, significantly, Dr. Vize's August 2010 medical opinion, in which he noted that Davis' symptoms "decreased with adequate compliance with medication," actually supports the ALJ's finding in this regard.  (Tr. 493).

3.      *Davis' Other Arguments are Without Merit*

Davis argues that the ALJ erred in viewing as a positive the fact that his symptoms were "stable." (Doc. #11 at 12). Specifically, Davis contends that the term "'stable' only indicates that [his] symptoms are neither increasing nor decreasing, but does not indicate the severity of the symptoms." (*Id.*). In response, the Commissioner concedes that referring to symptoms as "stable" without any context could be problematic under certain circumstances, but asserts that, in this case, where the ALJ's opinion properly set out "a baseline of [Davis'] limitations and abilities," the ALJ did not err in concluding that Davis' "stable" symptoms weighed against a finding of disability. (Doc. #16 at 15 (citing Tr. 20-22)). This Court agrees.

Indeed, when both the ALJ and the medical sources in the record referred to Davis being "stable," it was within the context of his symptoms being under control. For example, the ALJ noted that, after Davis was released from the hospital in September of 2009, medical professionals observed that he was "doing better on meds" and that his schizoaffective disorder was "stable." (Tr. 20, 422). This is the baseline from which future doctors (and the ALJ) evaluated Davis' impairments: from that time forward, his symptoms were well-controlled. (Tr. 432 (in December of 2009, Davis "continues to be stable and to do relatively well"), 510 (in August 2010, Davis' mood had been stable, and he believed the medication was working)). The ALJ expanded on his references to Davis' stability in October and December 2009 by noting that during those times "he denied psychotic or manic symptoms," and exhibited no psychosis or mania. (Tr. 20). Thus, the ALJ did not merely describe Davis' symptoms as "stable" without any explanation of that term's significance; rather, he articulated Davis' baseline symptoms (following his September 2009 hospitalization) and concluded – after reviewing the subsequent medical evidence – that these symptoms had not worsened significantly. As such, the ALJ's

20

reliance on the stability of Davis' symptoms was not error.

Davis next argues that the ALJ erred in determining that Dr. Vize's opinions should be given little weight, in part, because they contrasted so drastically with Davis' activities of daily living. (Doc. #11 at 13-20). Specifically, Davis argues that the ALJ erred in concluding that his hobby of playing Dungeons and Dragons is indicative of both an ability to maintain focus for extended periods of time on relatively complex activities and of his ability to interact with others. (*Id.* at 13-14).

As an initial matter, the Commissioner is correct that, in determining a claimant's RFC, an ALJ may properly consider his activities of daily living. *See Siterlet v. Sec'y of HHS*, 823 F.2d 918, 921 (6th Cir. 1987); *see also Soc. Sec. Rul.* 85-16, 1985 WL 56855, at *2 (1985) (determination of mental RFC involves consideration of the individual's activities of daily living). And, despite Davis' arguments to the contrary, the ALJ did not rely solely on Davis' ability to play Dungeons and Dragons in rejecting Dr. Vize's opinions, although he did properly conclude that playing this game involves "a great deal of creative verbal communication and interaction with both friends and strangers …." (Tr. 21). Although Davis' motion downplays the complexity of this game and the amount of interaction involved, the ALJ properly noted that the game requires both the ability to focus and to interact with others, facts that Davis acknowledged. (Tr. 74). And, even if the ALJ overstated the significance of Davis' ability to play the game, that would not change the result here. The ALJ cited numerous other activities that support his conclusion as to Davis' mental functioning, including the fact that he performs household chores, prepares meals, cares for his mother, cares for pets, reads, plays video games, uses a computer, plays a saxophone, and takes online college courses. (Tr. 20-21, 24).

In arguing that his activities of daily living are not inconsistent with Dr. Vize's opinions,

Davis cites a variety of facts, none of which are particularly compelling. For example, Davis asserts that CMH records indicate that he "was in special education in high school and obtained a GED." (Doc. #11 at 18). However, Davis testified at the administrative hearing that he graduated from high school and did *not* take special education classes in school (Tr. 49, 71), so it is not clear that CMH's records are correct in this respect. And, although he had some difficulties, he testified that he had taken at least some college classes, and was pursuing on-line education. (Tr. 49-50). Davis also pointed out that he had poor hygiene (specifically, "dirty blue jeans" and a "slight body odor") at an August 30, 2010 visit to Ms. Jones at CMH. (Doc. #11 at 19). But, while this is true, there were other instances in which Ms. Jones noted that Davis' hygiene was improving, and when she (and others) noted that Davis was neatly dressed and presentable. (Tr. 492, 502, 510). Finally, Davis asserts that he received assistance in completing college financial aid paperwork and that he was supported by members of the church band at practice. (Doc. #11 at 19). As the Commissioner correctly recognizes, however, the fact that Davis received assistance from his CMH case manager and/or "support" of some kind from his fellow musicians is not necessarily indicative of disabling mental limitations. Davis simply has not explained why the ALJ should have relied on these few isolated facts as opposed to all of the other evidence – substantial evidence – of Davis' activities of daily living.

Lastly, Davis argues that the ALJ placed too much emphasis on the fact that Davis was "attentive, engaged and cooperative" at the administrative hearing. (Doc. #11 at 20). As the Commissioner correctly notes, however, an ALJ is permitted to consider the claimant's behavior at the hearing. *See Brock v. Comm'r of Soc. Sec.*, 368 F. App'x 622, 625 (6th Cir. 2010) (citing *Ashworth v. Sullivan*, 951 F.2d 348 (6th Cir. 1991) (noting that the claimant's demeanor at the hearing belied her doctor's conclusions of disability)). Moreover, the ALJ did not give Dr.

Vize's opinions little weight solely because they were inconsistent with Davis' behavior at the hearing; rather, this was simply one of many factors the ALJ considered in determining whether these medical opinions were consistent with the record evidence, which was entirely proper.  *See* 20 C.F.R. §416.929(c); *see also supra* at 18-19.  In his motion, Davis claims that his behavior at the hearing – including his request that he be allowed to leave the hearing to get a drink of water and the "confusion" he expressed when asking how he would get back into the hearing room – was indicative of disabling mental limitations.  (Doc. #11 at 20-21).  The Court disagrees, however, believing – as the Commissioner asserts – that this more likely is simply a sign of Davis' unfamiliarity with the rules and procedures surrounding administrative hearings (something that is neither unique to Davis, nor to individuals with or without mental limitations). (Doc. #16 at 17).

In summary, the ALJ engaged in a detailed and thoughtful analysis of the record evidence.  In determining that Dr. Vize's opinions were entitled to little weight, he carefully and thoroughly explained how those two opinions were inconsistent with the vast majority of the medical evidence in the record, as well as with Davis' own reported activities of daily living and his behavior at the administrative hearing.  Moreover, the ALJ considered the opinion of the state agency psychologist, properly determining that it was entitled to significant weight because it was consistent with the record evidence.  (Tr. 25).  It was appropriate for the ALJ to rely on this opinion and to give it greater weight than Dr. Vize's opinions.  *See* 20 C.F.R. §416.927(e)(2)(i) (state agency consultants are "highly qualified physicians and psychologists who are also experts in Social Security disability evaluation").

All told, the ALJ's RFC finding properly took into account Davis' limitations.  The ALJ did not find that Davis has no limitations due to his mental impairments; rather, he concluded

23

that Davis has the RFC to perform only simple, routine, and repetitive work activities in a stable work environment, with only superficial contact with supervisors and coworkers, and no interaction with the general public. (Tr. 22). The ALJ's RFC, and his conclusion that Davis is not disabled under the Act, are supported by substantial evidence.

## III.    CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [16] be GRANTED, Davis' Motion for Summary Judgment [11] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: July 11, 2013                                s/David R. Grand
Ann Arbor, Michigan                             DAVID R. GRAND
                                                United States Magistrate Judge


## <u>NOTICE</u>

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

<u>**CERTIFICATE OF SERVICE**</u>

     The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 11, 2013.

                        s/Felicia M. Moses
                        FELICIA M. MOSES
                        Case Manager